# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Chattanooga Professional Baseball LLC d/b/a Chattanooga Lookouts; Agon Sports and Entertainment LLC; Boise Hospitality and Food Services LLC; Boise Professional Baseball LLC; Columbia Concessions & Catering LLC; Columbia Fireflies LLC d/b/a Columbia Fireflies; Eugene Emeralds Baseball Club Inc. d/b/a Eugene Emeralds; Evans Street Baseball Inc. d/b/a Binghamton Rumble Ponies; Fort Wayne Professional Baseball LLC d/b/a Fort Wayne TinCaps; Fredericksburg Baseball LLC d/b/a Fredericksburg Nationals; Greenjackets Baseball LLC; Greenjackets Hospitality Food & Beverage Services LLC; Greenville Drive LLC; Idaho Falls Baseball Club Inc. d/b/a Idaho Falls Chukars; Inland Empire 66ers Baseball Club of San Bernardino Inc. d/b/a Inland Empire 66ers; Panhandle Baseball Club Inc. d/b/a Amarillo Sod Poodles; SAJ Baseball LLC; San Antonio Missions Baseball Club Inc. d/b/a San Antonio Missions; 7th Inning Stretch LLC d/b/a Stockton Ports; 7th Inning Stretch LP d/b/a Delmarva Shorebirds; | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No: _____ |

       Plaintiffs,

v.

Philadelphia Indemnity Insurance Co.; Acadia Insurance Co.; National Casualty Co.; Scottsdale Indemnity Co.; Scottsdale Insurance Co.

       Defendants.

4846-8913-4527

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Chattanooga Professional Baseball LLC d/b/a Chattanooga Lookouts; Agon Sports and Entertainment LLC; Boise Hospitality and Food Services LLC; Boise Professional Baseball LLC; Columbia Concessions & Catering LLC; Columbia Fireflies LLC d/b/a Columbia Fireflies; Eugene Emeralds Baseball Club Inc. d/b/a Eugene Emeralds; Evans Street Baseball Inc. d/b/a Binghamton Rumble Ponies; Fort Wayne Professional Baseball LLC d/b/a Fort Wayne TinCaps; Fredericksburg Baseball LLC d/b/a Fredericksburg Nationals; Greenjackets Baseball LLC; Greenjackets Hospitality Food & Beverage Services LLC; Greenville Drive LLC; Idaho Falls Baseball Club Inc. d/b/a Idaho Falls Chukars; Inland Empire 66ers Baseball Club of San Bernardino Inc. d/b/a Inland Empire 66ers; Panhandle Baseball Club Inc. d/b/a Amarillo Sod Poodles; SAJ Baseball LLC; San Antonio Missions Baseball Club Inc. d/b/a San Antonio Missions; 7th Inning Stretch LLC d/b/a Stockton Ports; and 7th Inning Stretch LP d/b/a Delmarva Shorebirds (the "Teams"), by and through their undersigned attorneys, as and for their Complaint against Defendants Philadelphia Indemnity Insurance Co.; Acadia Insurance Co.; National Casualty Co.; Scottsdale Indemnity Co.; and Scottsdale Insurance Co. (the "Insurers"), allege as follows:

## INTRODUCTION

1.     In 2019, for the 15th straight year, more than 40,000,000 fans attended games played by 160 Minor League Baseball ("MiLB") teams located in smaller cities and communities throughout the United States. An excursion to the

2

minor league ballpark has been a low-cost American family tradition for more than 100 years. This is the first year in that entire period of time—through prior pandemics, two world wars, and many other global and national crises—that those magic words, "Play Ball," will not be heard in any of the ballparks around the country in which minor league baseball is played.

2.      There are several causes of the first-ever cessation of Minor League Baseball in 2020. These include continuing concerns for the health and safety of players, employees, and fans related to the SARS-CoV-2 virus; action and inaction by federal and state governments related to controlling the spread of the virus; and the decision by Major League Baseball ("MLB") that its teams will not meet their contractual obligations to provide players under contract to their affiliated minor league teams.

3.      The result of the cancellation of much or all of the MiLB season is catastrophic financial losses for all minor league teams, including the Plaintiff Teams.

4.      The operating model for MiLB teams is entirely dependent on receiving players, coaches, and other team personnel from the MLB team with which they have an affiliation agreement requiring that MLB team to provide players and other personnel. It is also dependent on being permitted by federal, state, and local governments to allow the admission of the thousands of fans who flock to every minor league game to enjoy a ball game, partake in the entertainment and food and beverage amenities associated with the minor league baseball

4846-8913-4527

experience, and purchase baseball caps and other merchandise sold in the ballpark. Though some MiLB teams have limited revenue from advertising and sponsorships, this revenue is largely tied to the number of fans the team can attract to the ballpark in a given year.

5.      The vast majority of MiLB teams' operating expenses, by contrast, bears little relationship to whether the teams are able to bring fans to the ballpark for ball games. The largest expense for many teams is the lease they pay to the municipal owners of the ballpark in which they play games. Most teams are responsible for a fixed lease payment of as much as one million dollars or more. In addition, MiLB teams generally have permanent employees needed to operate the team over an annual business cycle. The teams also have incurred many 2020 expenses related to marketing and advertising and the purchase and stocking of merchandise and food and beverage in preparation for the 2020 baseball season. Thus, on average, MiLB teams incur more than $2,000,000 in expenses to operate their teams without regard to whether they suffer interruption of their operations.

6.      Because of this business model, which requires variable revenue tied to game attendance but significant fixed operating expenses, and the fact that most MiLB team owners are small business owners or family businesses rooted in the community in which they own a team, the teams have little prospect for economic survival if the operation of their businesses is interrupted for any significant period of time within a season. These dire economic consequences are worsened by the obligation many teams will have to refund ticket, event, advertising, and

4

sponsorship revenue received in expectation that a full season of minor league baseball would be played in 2020.

7.     Given the business model for MiLB as described above, prudent owners of MiLB teams, including the Plaintiff Teams, purchased business-interruption insurance from the Defendant Insurers and paid significant premiums to protect themselves from business interruption, including the cancellation of games. These "all risks" policies cover the MiLB teams for business interruption in circumstances where, as here, there has been direct physical loss or damage, including, but not limited to loss of use, to the teams' ballparks or elsewhere caused by the SARS-CoV-2 virus, the governmental response to it, or the MiLB teams' inability to obtain players. As described in detail below, however, the Insurers have failed to meet their obligations, thereby placing the Teams in serious risk of economic failure and jeopardizing the future of America's Pastime as we know it.

8.     The Teams thus bring this action against the Insurers for breach of contract, anticipatory breach of contract, and a declaratory judgement that they are entitled to the full amount of coverage for which they paid premiums and of which they badly need.

## THE PARTIES

## I.     THE TEAMS

9.     The Teams fall into one of two categories—the Breach Plaintiffs or the Anticipatory-Breach Plaintiffs—depending on the steps their respective insurers

have taken to avoid honoring their contractual commitments. The Breach Plaintiffs bring Counts I and III. The Anticipatory-Breach Plaintiffs bring Counts II and III.[1]

## A.   The Breach Plaintiffs

10.    Plaintiff Agon Sports and Entertainment LLC is a limited liability company whose members are citizens of Georgia. During the applicable period of loss, Agon Sports and Entertainment LLC provided services for the Augusta GreenJackets and Boise Hawks and was insured under the same Policy as the Augusta GreenJackets and Boise Hawks, National Casualty Co. Policy No. KKO0000007974200.

11.    Plaintiff Boise Hospitality and Food Services LLC is a limited liability company whose members are citizens of Georgia. During the applicable period of loss, Boise Hospitality and Food Services LLC provided services for the Boise Hawks and was insured under the same Policy as the Boise Hawks, National Casualty Co. Policy No. KKO0000007974200.

12.    Plaintiff Boise Professional Baseball LLC ("Boise Hawks") is a limited liability company whose members are citizens of Alabama, California, Georgia, Idaho, New Jersey, and Virginia. During the applicable period of loss, the Boise Hawks were insured by National Casualty Co. under Policy No. KKO0000007974200.

13.    Plaintiff Chattanooga Professional Baseball LLC d/b/a Chattanooga Lookouts ("Chattanooga Lookouts") is a limited liability company whose members

---

[1] Count I is for breach of contract, Count II is for anticipatory breach of contract, and Count III is for declaratory judgment.

6

are citizens of Alabama, California, Colorado, Florida, Georgia, Indiana, Maryland, New Jersey, New York, North Carolina, South Carolina, Tennessee, and Virginia. During the applicable period of loss, the Chattanooga Lookouts were insured by National Casualty Co. under Policy No. KKO0000008089600.

14.     Plaintiff Columbia Concessions & Catering LLC is a limited liability company whose sole member is a citizen of Georgia. During the applicable period of loss, Columbia Concessions & Catering LLC provided services for the Columbia Fireflies and was insured under the same Policy as the Columbia Fireflies, National Casualty Co. Policy No. KKO0000008089600.

15.     Plaintiff Columbia Fireflies LLC d/b/a Columbia Fireflies ("Columbia Fireflies") is a limited liability company whose members are citizens of Alabama, California, Florida, Georgia, Indiana, Maryland, New Jersey, New York, South Carolina, Tennessee, and Virginia. During the applicable period of loss, the Columbia Fireflies were insured by National Casualty Co. under Policy No. KKO0000008089600.

16.     Plaintiff Eugene Emeralds Baseball Club Inc. d/b/a Eugene Emeralds ("Eugene Emeralds") is a corporation organized under the laws of Colorado with its principal place of business in Oregon. During the applicable period of loss, the Eugene Emeralds were insured by National Casualty Co. under Policy No. KKO0000007910700.

17.     Plaintiff Evans Street Baseball Inc. d/b/a Binghamton Rumble Ponies ("Binghamton Rumble Ponies") is a corporation organized under the laws of Georgia

with its principal place of business in New York. During the applicable period of loss, the Binghamton Rumble Ponies were insured by Acadia Insurance Co. under the Policy No. CNA 5237742-14.

18.    Plaintiff Fort Wayne Professional Baseball LLC d/b/a Fort Wayne TinCaps ("Fort Wayne TinCaps") is a limited liability company whose members are citizens of California, Florida, Georgia, Indiana, Maryland, New Jersey, New York, South Carolina, Tennessee, and Virginia. During the applicable period of loss, the Fort Wayne TinCaps were insured by National Casualty Co. under Policy No. KKO0000008089600.

19.    Plaintiff Greenjackets Baseball LLC ("Augusta GreenJackets") is a limited liability company whose members are citizens of Alabama, California, Georgia, Maryland, Massachusetts, and South Carolina. During the applicable period of loss, the Augusta GreenJackets were insured by National Casualty Co. under Policy No. KKO0000007974200.

20.    Plaintiff Greenjackets Hospitality Food & Beverage Services LLC is a limited liability company whose members are citizens of Georgia. During the applicable period of loss, Greenjackets Hospitality Food & Beverage Services LLC provided services for the Augusta GreenJackets and was insured under the same Policy as the Augusta GreenJackets, National Casualty Co. Policy No. KKO0000007974200.

21.    Plaintiff Greenville Drive LLC ("Greenville Drive") is a limited liability company whose members are citizens of South Carolina. During the applicable

8

period of loss, the Greenville Drive was insured by Philadelphia Indemnity Insurance Co. under Policy No. PHPK2079457.

22.     Plaintiff Idaho Falls Baseball Club Inc. d/b/a Idaho Falls Chukars ("Idaho Falls Chukars") is a corporation organized under the laws of Idaho with its principal place of business in Idaho. During the applicable period of loss, the Idaho Falls Chukars were insured by National Casualty Co. under Policy No. KKO0000007910700.

23.     Plaintiff Inland Empire 66ers Baseball Club of San Bernardino Inc. d/b/a Inland Empire 66ers ("Inland Empire 66ers") is a corporation organized under the laws of California with its principal place of business in California. During the applicable period of loss, the Inland Empire 66ers were insured by Scottsdale Indemnity Co. under Policy No. KKO0000007910400.

24.     Plaintiff Panhandle Baseball Club Inc. d/b/a Amarillo Sod Poodles ("Amarillo Sod Poodles") is a corporation organized under the laws of Texas with its principal place of business in Texas. During the applicable period of loss, the Amarillo Sod Poodles were insured by National Casualty Co. under Policy No. KKO0000007910700.

25.     Plaintiff San Antonio Missions Baseball Club Inc. d/b/a San Antonio Missions ("San Antonio Missions") is a corporation organized under the laws of Colorado with its principal place of business in Texas. During the applicable period of loss, the San Antonio Missions were insured by National Casualty Co. under Policy No. KKO0000007910700.

26.     Plaintiff 7th Inning Stretch LP d/b/a Delmarva Shorebirds ("Delmarva Shorebirds") is a limited partnership whose partners are citizens of California, Maryland, and Texas. During the applicable period of loss, the Delmarva Shorebirds were insured by Philadelphia Indemnity Insurance Co. under Policy No. PHPK2113479.

### B.     The Anticipatory-Breach Plaintiffs

27.     Plaintiff Fredericksburg Baseball LLC d/b/a Fredericksburg Nationals (successor to Potomac Baseball LLC) ("Fredericksburg Nationals") is a limited liability company whose members are citizens of Florida, Maryland, and Virginia. During the applicable period of loss, the Fredericksburg Nationals were insured by Scottsdale Insurance Co. under Policy No. KKS0000008192600.

28.     Plaintiff SAJ Baseball LLC is a limited liability company whose members are citizens of Florida, Maryland, and Virginia. During the applicable period of loss, SAJ Baseball LLC provided services to the Fredericksburg Nationals and was insured under the same Policy as the Fredericksburg Nationals, Scottsdale Insurance Co. Policy No. KKS0000008192600.

29.     Plaintiff 7th Inning Stretch LLC d/b/a Stockton Ports ("Stockton Ports") is a limited liability company whose members are citizens of California and Texas. During the applicable period of loss, the Stockton Ports were insured by Scottsdale Indemnity Co. under Policy No. KKI0000008310300.

## II.   THE INSURERS

30.     Defendant Acadia Insurance Co. is a corporation organized under the laws of Iowa with its principal place of business in Maine.

4846-8913-4527

31.     Defendant National Casualty Co. is a corporation organized under the laws of Ohio with its principal place of business in Arizona.

32.     Defendant Philadelphia Indemnity Insurance Co. is a corporation organized under the laws of Pennsylvania with its principal place of business in Pennsylvania.

33.     Defendant Scottsdale Indemnity Co. is a corporation organized under the laws of Ohio with its principal place of business in Arizona.

34.     Defendant Scottsdale Insurance Co. is a corporation organized under the laws of Ohio with its principal place of business in Arizona.

## JURISDICTION AND VENUE

35.     The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because, as detailed in **Exhibit A**, there is complete diversity of citizenship among the parties to the action and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

36.     The Court has personal jurisdiction over each of these claims because Philadelphia Indemnity Insurance Co. is incorporated under the laws of Pennsylvania and maintains its principal place of business therein (thus affording the Court general personal jurisdiction) and because Acadia Insurance Co., National Casualty Co., Scottsdale Indemnity Co., and Scottsdale Insurance Co. have consented to this Court's jurisdiction, either by the policy's terms or by obtaining a certificate of authority from the Pennsylvania Insurance Department.

4846-8913-4527

37.     The Court is a proper venue for this action under 28 U.S.C. § 1391 because Defendants are subject to the Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

## I.     THE NATURE OF THE COVID-19 PANDEMIC

38.     COVID-19 is an infectious disease caused by a recently discovered novel coronavirus, formally known as SARS-CoV-2. The first instances of the disease spreading to humans were diagnosed in China in or around December 2019, and the first reported case in the United States was in January 2020.

39.     The impact of the virus and the resulting pandemic on life and property has been staggering. Though testing has been severely limited, as of the filing date of this Complaint, more than 2,000,000 Americans have had confirmed cases of COVID-19, and more than 120,000 have died from it.

40.     The virus is easily transmitted from person to person and from surface to person. According to the World Health Organization (the "WHO"), the virus can spread from person to person through small droplets from the nose or mouth that are spread when a person with COVID-19 coughs or exhales. These droplets land on objects and surfaces around the person. Other people then catch the virus by touching these objects or surfaces, then touching their eyes, noses, or mouths. People can also catch the virus if they breathe in droplets from a person infected with the virus who coughs or exhales droplets.[2]

---

[2] *Q&A on Coronaviruses (COVID-19)*, World Health Organization (April 17, 2020), https://www.who.int/news-room/q-a-detail/q-acoronaviruses.

4846-8913-4527

41.     Infected individuals can be completely asymptomatic—and thus unaware that they may be spreading the virus through the mere touching of objects and surfaces. Indeed, studies have estimated that more than 40% of infected individuals may never develop any symptoms.[3] But even individuals who appear healthy and present no identifiable symptoms of the disease might still spread the virus by breathing, speaking, or touching objects and surfaces.

42.     According to a report in *The New York Times*, "[a]n infected person talking for five minutes in a poorly ventilated space can also produce as many viral droplets as one infectious cough."[4] And one human sneeze can expel droplets that can travel up to 27 feet at nearly a hundred miles an hour.[5]

43.     Although these droplets are smaller than mold, rust, or paint chips, they are physical objects that travel and attach to other surfaces and cause harm.

44.     Current evidence suggests that SARS-CoV-2 may remain viable for hours to days on surfaces made from a variety of materials.[6] The virus can survive and remain virulent on stainless steel and plastic for 3 to 6 days, on glass and

---

[3] Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected* (May 27, 2020, 12:43 PM)*,* https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-may-be-more-common-suspected-n1215481.

[4] *See* Yuliya Pashina-Kottas, et al., This 3-D Simulation Shows Why Social Distancing Is So Important, *The New York Times* (April 21, 2020), *available at* https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html (last visited June 12, 2020).

[5] Sarah Gibbens, "See how a sneeze can launch germs much farther than 6 feet," *National Geographic* (April 17, 2020), *available at* www.nationalgeographic.com/science/2020/04/coronavirus-covid-sneeze-fluid-dynamics-in-photos/ (last visited June 12, 2020).

[6] *Cleaning and Disinfection for Community Facilities*, Centers for Disease Control and Prevention (May 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html.

banknotes for 3 days, and on wood and cloth for 24 hours.[7] Testing of similar viruses suggests that SARS-CoV-2 can survive on ceramics, silicon, and paper for at least 5 days. And the Centers for Disease Control (the "CDC") confirmed that the virus was identified on surfaces of the *Diamond Princess* cruise ship a full 17 days after the cabins were vacated.[8]

45.     Without a vaccine to protect against COVID-19, effective control of the pandemic relies on measures designed to reduce human-to-human and surface-to-human exposure. The CDC have stated that the virus can spread when people are within 6 feet of each other or when a person comes in contact with a surface or object that has the virus on it.

46.     The nature of the virus has caused authorities to issue stay-in-place orders to protect persons and property. Indeed, authorities in each of the Teams' respective states have issued such orders, many of which observe the virus's threat to property.[9]

---

[7] Letter from Neeltje van Doremalen et al. to N. Eng. Journal of Med. (April 16, 2020), available at https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973.

[8] *Public Health Responses to COVID-19 Outbreaks on Cruise Ships—Worldwide, February–March 2020*, Centers for Disease Control and Prevention (March 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm.

[9] City of New Orleans,  *Mayoral Proclamation to Promulgate Emergency Orders During the State of Emergency Due to COVID-19* 2 (2020), http://nola.gov/mayor/executive-orders/emergency-declarations/03162020-mayoral-proclamation-to-promulgate-emergency-orders-during-the-state-of-emergency-due-to-co/?utm_campaign=City_of_New_Orleans&utm_content=&utm_medium=email&utm_source=govdelivery&utm_term= ; City of N.Y., *Emergency Executive Order No. 103* (2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-103.pdf ; State of Colo., *Executive Order D 2020 032* (2020), https://www.colorado.gov/governor/sites/default/files/inline-files/D%202020%20032%20Extending%20D%202020%20003.pdf ; Broward Cty. Adm'r, *Emergency Order 20-03* (2020), https://www.broward.org/CoronaVirus/Documents/BC-EmergencyOrder20-03.pdf; Pinellas Cty Adm'r (2020), http://www.pinellascounty.org/emergency/PDF/covid19/res20-20.pdf.

47.     For these reasons, it is statistically certain that the virus is present at the Teams' ballparks and nearby properties or that the threat of the virus's presence at the ballparks is imminent. Moreover, the ballparks are incapable of their intended function—serving as a venue for ball games attended by fans.

48.     The nature of the virus, and the social distancing required to mitigate its spread, have contributed to cancellations of the Teams' MiLB games.

## II.    GOVERNMENTS' RESPONSES TO THE PANDEMIC

49.     On December 31, 2019, the Chinese government notified the WHO of a "pneumonia of unknown cause" discovered in China's Wuhan province. On January 3, 2020, the U.S. federal government received its first formal notification of the outbreak in China. The United States reported its first COVID-19 case on January 20, and on January 30, the WHO declared the COVID-19 pandemic a "Public Health Emergency of International Concern." Yet in the first few months of 2020, the federal government failed to recognize the severity of the pandemic and did not contain the virus.

50.     By the beginning of February, 11,000,000 people in China's Wuhan province were under quarantine, and the extent of human-to-human transmission was clear. Aside from limiting travel from Wuhan, however, the U.S. federal government took little action. Even though funding and medical equipment were being depleted by the day, the U.S. federal government did not authorize new funds or require the production of testing kits, ventilators, or personal protective equipment for healthcare workers.

4846-8913-4527

51.     In February, the virus spread throughout the United States largely undetected. Though the CDC began shipping testing kits to laboratories on February 5, the kits were later determined to be flawed, rendering the test unreliable. By February 26, the CDC were still testing fewer than 100 patients daily, notwithstanding that the CDC were telling state and local officials that their testing capacity was more than adequate to meet current testing demands.

52.     On March 13, 2020, the U.S. federal government declared a national emergency. Three days later, the CDC and members of the national Coronavirus Task Force issued public guidance, styled as "30 Days to Slow the Spread," that advocated for the first time far-reaching social-distancing measures, such as working from home; avoiding shopping trips and gatherings of more than 10 people; and staying away from bars, restaurants, and food courts.

53.     The failure of the federal government to build an effective wall preventing the continued migration of the virus from states that were hit early to the rest of the country meant that states took the lead in combating the virus's spread. State after state imposed sweeping restrictions on citizens' daily lives to protect them and stop the spread. Most states restricted or prohibited the operation of non-essential businesses, prohibited public gatherings, or required individuals to stay at home except for essential purposes.

54.     According to a Columbia University study, if the government had imposed social-distancing measures just one week earlier—on March 8 instead of March 15—the United States would have avoided 703,975 confirmed cases (62%)

16

and 35,927 reported deaths (55%) as of May 3.[10] And if social distancing and lockdowns had begun just two weeks earlier—on March 1—the country would have seen a reduction of 960,937 (84%) cases and 53,990 (83%) deaths.

## III.   MAJOR LEAGUE BASEBALL DOES NOT PROVIDE PLAYERS

55.   Fans come to MiLB baseball games to see the players. But the Teams do not employ or manage the baseball players who draw fans to the park. Rather, Major League Baseball teams supply the players to each Team through player development contracts.

56.   Each Team manages the business aspects of its operations, such as marketing and promotions and sales of tickets, parking, advertising, concessions, and merchandise. But under the player development contracts, the parent Major League Baseball club controls and makes all decisions related to the players, including paying their salaries and determining which teams they play for and when.

57.   The Teams' players are thus under the exclusive control of the parent club, which decides which players the Team receives and, indeed, whether it receives any players at all.

58.   The Professional Baseball Agreement entered into between Major League and Minor League Baseball and the Player Development Contract between MLB and MiLB teams set forth the contractual obligations of the MLB teams to supply players to the MiLB teams. Pursuant to those agreements, MLB teams were

---

[10] Jeffrey Shaman et al., *Differential Effects of Intervention Timing on COVID-19 Spread in the United States*, MedRxiv (May 29, 2020), https://www.medrxiv.org/content/10.1101/2020.05.15.20103655v2.full.pdf+html.

required to provide players to MiLB teams to enable the start of the MiLB season in early-April 2020. To date, the MLB teams have not met their obligations under these agreements and supplied players. It is now clear that MLB teams will not provide players to MiLB teams for the entire 2020 season. Indeed, several MLB teams have announced significant reductions in the number of players under contract, thereby rendering it infeasible for them to provide players in a manner consistent with their contractual agreements.

59.     MLB's denial of players to the MiLB Teams is a cause of the Teams' business interruptions.

## IV.   THE TEAMS SUFFER BUSINESS-INCOME LOSSES

60.     As a result of the virus, the governmental response, and Major League Baseball's failure to provide baseball players, the Teams have been deprived of their primary source of revenue—fans coming to the ballpark and paying for game tickets, merchandise, food and beverage, and partaking in other amenities. Though some MiLB teams have limited revenue from advertising and sponsorships, this revenue is largely tied to the number of fans the team can attract to the ballpark in a given year.

61.     2019, for example, was a stellar year for MiLB. More than 40,000,000 fans attended such games, marking the 15th consecutive season that MiLB's teams drew more than 40,000,000 fans. The 2019 season also marked MiLB's largest year-over-year increase in attendance since the 2006 season and marked the 9th-largest single-season total in MiLB's history.

18

62.     This year, however, there are no games and no fans. As such, the Teams' primary income streams have come to a halt. Yet the fixed costs of operating a baseball stadium remain, such as fixed lease payments and payroll for permanent employees needed to operate the team over an annual business cycle.

63.     The Teams have therefore suffered, and will continue to suffer, significant business-income losses, expenses, and damages in a number of forms, including, but not limited to:

      a.  Loss of or diminished ticket sales;

      b.  Loss of or diminished parking sales;

      c.  Loss of or diminished concessions sales;

      d.  Loss of or diminished merchandise sales; and

      e.  Loss of or diminished advertising sales.

64.     The Teams have incurred, and will continue to incur, further losses, expenses, and damages in the form of normal operating expenses, including, but not limited to, lease payments and payroll costs.

65.     With no players, no games, and no fans, the Teams' losses of business income for the 2020 MiLB baseball season have been near total. With virtually no source of income, and accruing expenses, the Teams face catastrophic financial losses.

## V.   THE POLICIES PROVIDE COVERAGE

66.      In exchange for substantial premiums, the Insurers sold the Policies covering the Teams as the named insureds.

19

67.     The Teams' Policies are materially similar. Each is a commercial all-risk first-party property & casualty policy with similar, if not identical, grants of coverage for "business income" losses. To simplify presentation of the coverage disputes at issue in this suit, the Teams set forth relevant provisions of the Policy of Greenville Drive LLC (the "Policy"). The parallel provisions of the other Teams' Policies are cited herein, and all Policies are exhibited in their entireties to this Complaint. *See* **Exhibits B–I**.

68.     The Policy's period of coverage is from December 31, 2019 to December 31, 2020. CPD-PIIC.[11]

69.     The Policy provides coverage per occurrence. PI-ULT-010 at 5.[12]

70.     The Policy is divided into, among other types of coverage, a "Property Coverage Form," *see* PI-ULT-007 at 1–24,[13] and a "Business Income with Extra Expense Coverage Form," *see* PI-ULT-010 at 1–13.[14]

---

[11] Agon Sports and Entertainment LLC, Boise Hospitality and Food Services LLC, Boise Professional Baseball LLC, Greenjackets Baseball LLC, and Greenjackets Hospitality Food & Beverage Services LLC (May 08, 2019 to May 08, 2020); Chattanooga Professional Baseball LLC, Columbia Concessions & Catering LLC, Columbia Fireflies LLC, and Fort Wayne Professional Baseball LLC (August 1, 2019 to August 1, 2020); Eugene Emeralds Baseball Club Inc., Idaho Falls Baseball Club Inc., Panhandle Baseball Club Inc., and San Antonio Missions Baseball Club Inc. (March 31, 2019 to March 31, 2020); Inland Empire 66ers Baseball Club of San Bernardino Inc. (March 31, 2019 to March 31, 2020); Evans Street Baseball Inc. (June 1, 2019 to June 1, 2020); Fredericksburg Baseball LLC and SAJ Baseball LLC (November 1, 2019 to November 1, 2020); 7th Inning Stretch LLC (January 28, 2020 to January 28, 2021); and 7th Inning Stretch LP (March 30, 2020 to March 30, 2021).

[12] Acadia Insurance Co., *see* CP 00 30 10 12 at 5; National Casualty Co., *see* CP 00 30 10 12 at 4; Scottsdale Indemnity Co., *see* CP 00 30 10 12 at 4; Scottsdale Insurance Co., *see* CP 00 30 10 12 at 4.

[13] Acadia Insurance Co., *see* CP 00 10 10 12 at 1–16; National Casualty Co., *see* CP 00 10 10 12 at 1–14; Scottsdale Indemnity Co., *see* CP 00 10 10 12 at 1–14; Scottsdale Insurance Co., *see* CP 00 10 10 12 at 1–14.

[14] Acadia Insurance Co., *see* CP 00 30 10 12 at 1–9; National Casualty Co., *see* CP 00 30 10 12 at 1–8; Scottsdale Indemnity Co., *see* CP 00 30 10 12 at 1–8; Scottsdale Insurance Co., *see* CP 00 30 10 12 at 1–8.

71.     The Property Coverage Form covers "direct physical **'loss'**[15] to Covered Property[16] caused by or resulting from any of the Covered Causes of Loss."[17] PI-ULT-007 at 1.[18]

72.     The limit of insurance applies per occurrence. PI-ULT-007 at 14–15.[19]

73.     The Property Coverage Form provides "Additional Coverages." See PI-ULT-007 at 4–9.[20]

74.     The Additional Coverages include "expenses to remove debris of Covered Property caused by or resulting from any of the Covered Causes of Loss that occur during the policy period." PI-ULT-007 at 4–5.[21]

---

[15] "**'Loss'** means accidental loss or damage." PI-ULT-007 at 24. The Policies of Acadia Insurance Co., National Casualty Co., Scottsdale Indemnity Co., and Scottsdale Insurance Co. do not define "loss."

[16] "Covered Property" means, among other things, the "buildings or structures" described in the declarations. PI-ULT-007 at 1–3, 23; Acadia Insurance Co., *see* CP 00 10 10 12 at 1–2; National Casualty Co., *see* CP 00 10 10 12 at 1–2; Scottsdale Indemnity Co., CP 00 10 10 12 at 1–2; Scottsdale Insurance Co., *see* CP 00 10 10 12 at 1–2.

[17] "**Covered Causes of Loss** means Risks of Direct Physical Loss unless the **'loss'** is:

**1.** Excluded in Section **B., Exclusions**; or

**2.** Limited in Section **C., Limitations**;

that follow."

PI-ULT-007 at 4, PI-ULT-008 at 1; Acadia Insurance Co., *see* CP 00 10 10 12 at 3; National Casualty Co., *see* CP 00 10 10 12 at 2; Scottsdale Indemnity Co., *see* CP 00 10 10 12 at 2; Scottsdale Insurance Co., *see* CP 00 10 10 12 at 2.

[18] Acadia Insurance Co., *see* CP 00 10 10 12 at 1; National Casualty Co., *see* CP 00 10 10 12 at 1; Scottsdale Indemnity Co.; *see* CP 00 10 10 12 at 1; Scottsdale Insurance Co., *see* CP 00 10 10 12 at 1.

[19] Acadia Insurance Co., *see* CP 00 10 10 12 at 9–10; National Casualty Co., *see* CP 00 10 10 12 at 8–9; Scottsdale Indemnity Co., *see* CP 00 10 10 12 at 8–9; Scottsdale Insurance Co., *see* CP 00 10 10 12 at 8–9.

[20] Acadia Insurance Co., *see* CP 00 10 10 12 at 3–7; National Casualty Co., *see* CP 00 10 10 12 at 3–6; Scottsdale Indemnity Co., *see* CP 00 10 10 12 at 3–6; Scottsdale Insurance Co., *see* CP 00 10 10 12 at 3–6.

[21] Acadia Insurance Co., *see* CP 00 10 10 12 at 3–4; National Casualty Co., *see* CP 00 10 10 12 at 3–4; Scottsdale Indemnity Co., *see* CP 00 10 10 12 at 3–4; Scottsdale Insurance Co., *see* CP 00 10 10 12 at 3–4.

4846-8913-4527

75.     "If it is necessary to move Covered Property from the described premises to preserve it from **'loss'** by any of the Covered Causes of Loss," the Additional Coverages include, under certain conditions, "any direct physical **'loss'** to that property." PI-ULT-007 at 5.[22]

76.     The Additional Coverages include "expenses to extract **'pollutants'**[23] from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the **'pollutants'** is caused by or results from any of the Covered Causes of Loss that occur during the policy period." PI-ULT-007 at 6.[24]

77.     The Business Income with Extra Expense Coverage Form covers "the actual loss of Business Income [the policyholder] sustain[s] due to the necessary suspension of [the policyholder's] **'operations'** during the **'period of restoration'**. The suspension must be caused by direct physical **'loss'** to property at the premises described in the Declarations, or within 1000 feet of the premises, caused by or resulting from any of the Covered Causes of Loss." PI-ULT-010 at 1–2.[25]

---

[22] Acadia Insurance Co., *see* CP 00 10 10 12 at 4; National Casualty Co., *see* CP 00 10 10 12 at 4; Scottsdale Indemnity Co., *see* CP 00 10 10 12 at 4; Scottsdale Insurance Co., *see* CP 00 10 10 12 at 4. Only Evans Street Baseball Inc. purchased this coverage.

[23] "'**Pollutants'** means any solid, liquid, gaseous or thermal irritant or containment, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed." PI-ULT-007 at 24; Acadia Insurance Co., *see* CP 00 10 10 12 at 16; National Casualty Co., *see* CP 00 10 10 12 at 14; Scottsdale Indemnity Co., *see* CP 00 10 10 12 at 14; Scottsdale Insurance Co., *see* CP 00 10 10 12 at 14.

[24] Acadia Insurance Co., *see* CP 00 10 10 12 at 5; National Casualty Co., *see* CP 00 10 10 12 at 4; Scottsdale Indemnity Co., *see* CP 00 10 10 12 at 4; Scottsdale Insurance Co., *see* CP 00 10 10 12 at 4.

[25] Acadia Insurance Co., *see* CP 00 30 10 12 at 1; National Casualty Co., *see* CP 00 30 10 12 at 1; Scottsdale Indemnity Co., *see* CP 00 30 10 12 at 1; Scottsdale Insurance Co., *see* CP 00 30 10 12 at 1.

4846-8913-4527

78.     "Business Income means the: **a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and **b.** Continuing normal operating expenses incurred, including payroll." PI-ULT-010 at 2.[26]

79.     The Business Income with Extra Expense Coverage Form provides "Additional Coverages." See PI-ULT-010 at 2–5.[27]

80.     The Additional Coverages include certain Extra Expenses. "Extra Expenses means necessary expenses [the policyholder] incur[s] during the **'period of restoration'**[28] that [the policyholder] would not have incurred if there had been no direct physical **'loss'** to property caused by or resulting from any of the Covered Causes of Loss." PI-ULT-010 at 2.[29]

81.     The Additional Coverages include "the actual loss of Business Income [the policyholder] sustain[s] and necessary Extra Expenses [the policyholder]

---

[26] Acadia Insurance Co., *see* CP 00 30 10 12 at 1; National Casualty Co., *see* CP 00 30 10 12 at 1; Scottsdale Indemnity Co., *see* CP 00 30 10 12 at 1; Scottsdale Insurance Co., *see* CP 00 30 10 12 at 1.

[27] Acadia Insurance Co., *see* CP 00 30 10 12 at 2–4; National Casualty Co., *see* CP 00 30 10 12 at 2–4; Scottsdale Indemnity Co., *see* CP 00 30 10 12 at 2–4; Scottsdale Insurance Co., *see* CP 00 30 10 12 at 2–4.

[28] "**'Period of Restoration'** means the period of time that

**a.** Begins:

**(1)** 72 hours after the time of direct physical **'loss'** for Business Income coverage; or

**(2)** Immediately after the time of direct physical **'loss'** for Extra Expense coverage; and

**b.** Ends on the earlier of:

**(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(2)** The date when business is resumed at a new permanent location."

PI-ULT-010 at 12; Acadia Insurance Co., *see* CP 00 30 10 12 at 9; National Casualty Co., *see* CP 00 30 10 12 at 8; Scottsdale Indemnity Co., *see* CP 00 30 10 12 at 8; Scottsdale Insurance Co., *see* CP 00 30 10 12 at 8.

[29] Acadia Insurance Co., *see* CP 00 30 10 12 at 1–2; National Casualty Co., *see* CP 00 30 10 12 at 1–2; Scottsdale Indemnity Co., *see* CP 00 30 10 12 at 1–2; Scottsdale Insurance Co., *see* CP 00 30 10 12 at 1–2. Evans Street Baseball Inc. did not purchase this coverage.

4846-8913-4527

incur[s] caused by action of Civil Authority that prohibits access to the described premises due to direct physical **'loss'** to property other than at the described premises caused by or resulting from any of the Covered Causes of Loss." PI-ULT-010 at 2–3.[30]

82.     The Additional Coverages include "the actual loss of **'Rental Value'**[31] [the policyholder] incur[s] during the period." PI-ULT-010 at 4.[32]

83.     The Policy purports to exclude from coverage "loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease [the "Exclusion"]." CP P 003 07 06 at 1.[33] That Exclusion does not preclude the Teams' claims for coverage because, among other reasons, it is void, unenforceable, and inapplicable. Nor does any other policy provision exclude the Teams' claims for coverage.

---

[30] Acadia Insurance Co., *see* CP 00 30 10 12 at 2; National Casualty Co., *see* CP 00 30 10 12 at 2; Scottsdale Indemnity Co., *see* CP 00 30 10 12 at 2; Scottsdale Insurance Co., *see* CP 00 30 10 12 at 2.

[31] "**'Rental Value'** means:

**a.** Total anticipated rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by [the policyholder]; and

**b.** Amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be [the policyholder's] obligations; and

**c.** Fair rental value of any portion of the described premises which is occupied by [the policyholder]."
PI-ULT-010 at 13; Acadia Insurance Co., *see* CP 00 30 10 12 at 9; National Casualty Co., *see* CP 00 30 10 12 at 8; Scottsdale Indemnity Co., *see* CP 00 30 10 12 at 8; Scottsdale Insurance Co., *see* CP 00 30 10 12 at 8.

[32] Acadia Insurance Co., *see* CP 00 30 10 12 at 3; National Casualty Co., *see* CP 00 30 10 12 at 3; Scottsdale Indemnity Co., *see* CP 00 30 10 12 at 3; Scottsdale Insurance Co., *see* CP 00 30 10 12 at 3. Only Greenville Drive LLC and 7th Inning Stretch LP purchased this coverage.

[33] Acadia Insurance Co., *see* CP 01 78 08 08 at 1; National Casualty Co., *see* CP 01 40 07 06 at 1; Scottsdale Indemnity Co., *see* CP 01 40 07 06 at 1; Scottsdale Insurance Co., *see* CP 01 40 07 06 at 1.

## VI.   THE INSURERS DENY THE TEAMS' CLAIMS FOR COVERAGE

84.    All Teams have made claims for coverage with their respective Insurers. With minor variations in their positions, the Insurers have all denied or will all deny the Teams' claims for coverage on the grounds that the Team's losses (1) do not result from direct physical loss or damage to property and (2) are barred by the Exclusion.

85.    Philadelphia Indemnity Insurance Co., in denying the claims of Greenville Drive LLC and 7th Inning Stretch LP, took the position that the Teams' losses were not attributable to any physical loss or damage, whether at the insured locations or elsewhere. Accordingly, Philadelphia Indemnity Insurance Co. denied coverage under the policies' grants of coverage related to property, business interruption, and civil authority. Philadelphia Indemnity Insurance further denied coverage because it deemed the Exclusion applicable.

86.    Acadia Insurance Co., in denying the claim of Evans Street Baseball Inc., took the position that the Team's losses were not attributable to any physical loss or damage, whether at the insured location or elsewhere. Accordingly, Acadia Insurance Co. denied coverage under the policy's grants of coverage related to property, business interruption, and civil authority. Acadia Insurance Co. further denied coverage because it deemed the Exclusion applicable.

87.    National Casualty Co., in denying the claims of Agon Sports and Entertainment LLC, Boise Hospitality and Food Services LLC, Boise Professional Baseball LLC, Greenjackets Baseball LLC, and Greenjackets Hospitality Food & Beverage Services LLC; Chattanooga Professional Baseball LLC, Columbia

25

4846-8913-4527

Concessions & Catering LLC, Columbia Fireflies LLC, and Fort Wayne Professional Baseball LLC; and Eugene Emeralds Baseball Club Inc., Idaho Falls Baseball Club Inc., Panhandle Baseball Club Inc., and San Antonio Missions Baseball Club Inc., took the position that the Teams' losses were not attributable to any physical loss or damage, whether at the insured locations or elsewhere. Accordingly, National Casualty Co. denied coverage under the policies' grants of coverage related to property, business interruption, and civil authority. National Casualty Co. further denied coverage because it deemed the Exclusion applicable.

88.     Scottsdale Indemnity Co., in denying the claim of Inland Empire 66ers Baseball Club of San Bernardino Inc., took the position that the Team's losses were not attributable to any physical loss or damage, whether at the insured location or elsewhere. Accordingly, Scottsdale Indemnity Co. denied coverage under the policy's grants of coverage related to property, business interruption, and civil authority. Scottsdale Indemnity Co. further denied coverage because it deemed the Exclusion applicable.

89.     Scottsdale Indemnity Co.'s position on the claim of Inland Empire 66ers Baseball Club of San Bernardino Inc. is representative of the position it will take with respect to that of 7th Inning Stretch LLC, the other Team it insures.

90.     Scottsdale Insurance Co. has not yet denied the claim of any Team. Yet its position with respect to those of Fredericksburg Baseball LLC d/b/a Fredericksburg Nationals and SAJ Baseball LLC, which it insures, will plausibly align with the positions taken by all other Insurers that have denied claims. Indeed,

every Insurer to deny coverage has relied on the same grounds—the supposed lack of physical loss or damage and the Exclusion. In fact, Scottsdale Insurance Co. itself has taken the exact same position with respect to other claims for coverage related to or arising out of the pandemic. *See, e.g.*, *Ybarra Investments, Inc. v. Scottsdale Ins. Co.*, No. 4:20-cv-01818 (S.D. Tex. filed May 26, 2020).

91.     The Insurers' positions denying coverage to the Teams are wrong. As set forth herein, there has been direct physical loss or damage, including, but not limited to, loss of use, at the Teams' ballparks or elsewhere caused by the SARS-CoV-2 virus, the governmental response to it, or the Teams' inability to obtain players. Moreover, the Exclusion does not defeat the Teams' claims for coverage because, among other reasons, it is void, unenforceable, and inapplicable.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

92.     This cause of action is brought by the Breach Plaintiffs against their respective Defendant-Insurers.

93.     The Breach Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

94.     The Policies constitute valid and enforceable contracts between the Breach Plaintiffs, as the named insureds, and the respective Defendants, as the companies providing the insurance under the Policies.

95.     As described above, the Breach Plaintiffs have sustained, and are continuing to sustain, losses covered under the Policies and during the Policy periods.

27

96.     The Breach Plaintiffs provided prompt notice of their losses, performed all obligations required of them under the respective Policies, and were ready, willing, and able to perform their obligations under the Policies.

97.     The breaches occurred when the respective Defendants denied some or all coverage owed to the Breach Plaintiffs under the Policies:

| Breach Plaintiff | Defendant | Policy No. | Date of Denial |
|---|---|---|---|
| Agon Sports and Entertainment LLC, Boise Hospitality and Food Services LLC, Boise Professional Baseball LLC, Greenjackets Baseball LLC, and Greenjackets Hospitality Food & Beverage Services LLC | National Casualty Co. | KKO0000007974200 | May 8, 2020 |
| Chattanooga Professional Baseball LLC, Columbia Concessions & Catering LLC, Columbia Fireflies LLC, and Fort Wayne Professional Baseball LLC | National Casualty Co. | KKO0000008089600 | April 17, 2020 |
| Eugene Emeralds Baseball Club Inc., Idaho Falls Baseball Club Inc., Panhandle Baseball Club Inc., and San Antonio Missions Baseball Club Inc. | National Casualty Co. | KKO0000007910700 | May 7, 2020 |
| Evans Street Baseball Inc. | Acadia Insurance Co. | CNA 5237742-14 | April 13, 2020 |
| Greenville Drive LLC | Philadelphia Indemnity Insurance Co. | PHPK2079457 | May 19, 2020 |
| Inland Empire 66ers Baseball Club of San Bernardino Inc. | Scottsdale Indemnity Co. | KKO0000007910400 | May 7, 2020 |

4846-8913-4527

| 7th Inning Stretch LP | Philadelphia Indemnity Insurance Co. | PHPK2113479 | June 15, 2020 |
|---|---|---|---|

98.    Under the terms of the Policies, the respective Defendants must pay up to the Policies' limits of insurance for any loss covered under the Policies, subject only to sublimits, time limits, or deductibles for specific coverages.

99.    The respective Defendants have not paid any or all amounts due to the Breach Plaintiffs in connection with their claims. Instead, the respective Defendants have asserted various inapplicable bases to wrongfully deny coverage for the Breach Plaintiffs' claims.

100.    As a direct and proximate result of the respective Defendants' breaches of contract, the Breach Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

## SECOND CAUSE OF ACTION
### (Anticipatory Breach of Contract)

101.    This cause of action is brought by the Anticipatory-Breach Plaintiffs against their respective Defendant-Insurers.

102.    The Anticipatory-Breach Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

103.    The Policies constitute valid and enforceable contracts between the Anticipatory-Breach Plaintiffs, as the named insureds, and the respective Defendants, as the companies providing the insurance under the Policies.

4846-8913-4527

104.    As described above, the Anticipatory-Breach Plaintiffs have sustained, and are continuing to sustain, losses covered under the Policies and during the Policy periods.

105.    The Anticipatory-Breach Plaintiffs provided prompt notice of their losses, performed all obligations required of them under the respective Policies, and were ready, willing, and able to perform their obligations under the Policies.

106.    The anticipatory breaches occurred when the respective Defendants absolutely repudiated their contractual obligations by declaring an unconditional intent not to perform the Policies according to their terms.

107.    Under the terms of the Policies, the respective Defendants must pay up to the Policies' limits of insurance for any loss covered under the Policies, subject only to sublimits, time limits, or deductibles for specific coverages.

108.    The respective Defendants have not paid any or all amounts due to the Anticipatory-Breach Plaintiffs in connection with their claims. Instead, the Defendants have asserted various inapplicable bases to wrongfully deny coverage for the Anticipatory-Breach Plaintiffs' claims.

109.    As a direct and proximate result of the respective Defendants' anticipatory breaches of contract, the Anticipatory-Breach Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

## THIRD CAUSE OF ACTION
### (Declaratory Judgement)

110.   Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

111.   This cause of action is brought by all Plaintiffs against all Defendants.

112.   Pursuant to the terms of the Policies, the Insurers are obligated to pay, up to the limit of liability or any applicable sublimit or time period, for property damage or business-interruption losses covered under the Policies and not otherwise excluded from coverage.

113.   As detailed above, the Teams' losses are covered under multiple coverages of the Policies and are not excluded from coverage.

114.   The Insurers dispute, or the Teams reasonably believe the Insurers will dispute, their respective legal obligations to pay the Teams' claims.

115.   Pursuant to 28 U.S.C. § 2201, the Teams are entitled to a declaration by this Court of their respective Insurers' obligations under the Policies.

116.   An actionable and justiciable controversy exists or will exist between the Teams and their respective Insurers concerning the proper construction of the Policies, and the rights and obligations of the parties thereto, with respect to the Teams' claims for expenses or losses arising out of the coronavirus pandemic.

117.   Pursuant to 28 U.S.C. § 2201, this Court should enter a declaratory judgment in favor of the Teams and against their respective Insurers, declaring that there is coverage available for the Teams' claims up to the full limits or applicable sublimits of the Policies and, pursuant to 28 U.S.C. § 2202, declaring any other

relief this Court deems proper.  Such a declaration would resolve the current controversy between the Teams and their respective Insurers.

## PRAYER FOR RELIEF

WHEREFORE, the Teams pray for relief as follows:

(a)     On the First Cause of Action, the Breach Plaintiffs request that the Court enter judgment against the respective Defendants, awarding the Breach Plaintiffs damages in an amount to be determined at trial, but more than $75,000, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

(b)     On the Second Cause of Action, the Anticipatory-Breach Plaintiffs request that the Court enter judgment against the respective Defendants, awarding the Anticipatory-Breach Plaintiffs damages in an amount to be determined at trial, but more than $75,000, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

(c)     On the Third Cause of Action, Plaintiffs request that the Court enter a declaratory judgment in favor of the Teams against their respective Insurers that the Teams' losses are covered under the Policies, declaring that their respective Insurers are required to pay the Teams, up to the applicable limits of the Policies, for claimed amounts under the Policies;

4846-8913-4527

(d)     For all Causes of Action, all pre-judgment and post-judgment interest as allowed by law and all the Teams' costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees; and

(e)     The Teams request such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Teams hereby demand a trial by jury on all issues so triable.

Date:  June 23, 2020

Respectfully submitted,

*/s/ Robin Cohen*

Robin Cohen (*pro hac vice* to follow)
John Briody (*pro hac vice* to follow)
**MCKOOL SMITH, P.C.**
One Manhattan West
395 9th Avenue, 50th Floor
New York, NY 10001
Telephone:   (212) 402-9400
Facsimile:    (212) 402-9444

Patrick Pijls (*pro hac vice* to follow)
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone:   (214) 978-4000
Facsimile:    (214) 978-4044

***Attorneys for Plaintiffs***

*/s/ Andrew L Sandler*

Andrew L Sandler (PA Bar I.D. 40142)
Stephen M. LeBlanc (*pro hac vice* to follow)
Rebecca Guiterman (*pro hac vice* to follow)
**MITCHELL SANDLER LLC**
1120 20th Street NW, Suite 725
Washington, DC 20036
Telephone:   (202) 886-5260

***Attorneys for Plaintiffs***

4846-8913-4527